1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GILBERT IVAN JOHNSON,<br><br>                              Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI, Acting<br>Commissioner of Social Security,<br><br>                              Defendant. | Case No.:  21cv01284-NLS<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND<br>DENYING IN PART PLAINTIFF'S<br>MOTION FOR SUMMARY<br>JUDGMENT;**<br><br>**(2) GRANTING IN PART AND<br>DENYING IN PART DEFENDANT'S<br>CROSS-MOTON FOR SUMMARY<br>JUDGMENT;**<br><br>**(3) GRANTING PLAINTIFF'S<br>MOTION TO REMAND TO THE<br>COMMISSIONER FOR FURTHER<br>PROCEEDINGS CONSISTENT<br>WITH THIS ORDER.**<br><br>**[ECF Nos. 12, 15]** |

        //
        //

1    Plaintiff Gilbert Ivan Johnson ("Plaintiff") brings this action under the Social
2    Security Act, 42 U.S.C. § 405(g), and seeks judicial review of a final decision by the
3    Commissioner of Social Security ("Commissioner") denying his application for social
4    security disability benefits under Title II of the Social Security Act.  Plaintiff filed a
5    motion for summary judgment, Defendant filed an Opposition and Cross-Motion for
6    summary judgement, and Plaintiff filed a Reply.  ECF Nos. 12, 15, and 16.

7    After considering the papers submitted, the administrative record, and the
8    applicable law, for the reasons set forth below, the Court **GRANTS IN PART AND**
9    **DENIES IN PART** Plaintiff's motion for summary judgment, **GRANTS IN PART**
10   **AND DENIES IN PART** the Commissioner's cross- motion for summary judgment, and
11   **GRANTS** Plaintiff's motion for **REMAND** to the Commissioner.  The Court finds the
12   ALJ erred by making a single disability determination for the entire five-year period of
13   the claim without considering whether Plaintiff was disabled by his right hand/arm
14   limitations during an earlier qualifying period.  This error affected the ALJ's final
15   conclusions as to Plaintiff's residual functional capacity.

16   Therefore, the court remands to the ALJ to determine whether Plaintiff is entitled
17   to disability benefits during a portion of the five-year period of his claim from the date of
18   his elbow injury in April 2012 until approximately July 2013 when he reached a plateau
19   following recovery from elbow surgery.  AR 1127. [1]

20   I.    BACKGROUND
21   A.    Procedural History
22   Plaintiff filed a Title II application for Social Security Disability Insurance on
23   May 27, 2014, in which he alleged disability beginning on April 27, 2012, due to lower
24   back pain, right shoulder pain, right elbow pain, depression, anxiety, and insomnia.
25   Administrative Record ("AR") 131-142, 152-55, 157-62, 329-35, 454, 483.  The
26
27   _____
     [1] The parties have expressly consented that all proceedings in this case may be heard and finally
28   adjudicated by a magistrate judge. 28 U.S.C. § 646(c); Fed. R. Civ.  P. 73; ECF No. 5.

Commissioner denied Plaintiff's claim initially on September 5, 2014, AR 98-112, and on reconsideration on January 6, 2015. AR 113-127, 157–62. Plaintiff requested a hearing before an Administrative Law Judge (ALJ) which was held on June 12, 2017. AR 74-97. Plaintiff testified at the hearing, and he was represented by counsel. *Id.* An impartial vocational expert and an impartial medical expert also testified at the hearing. *Id.*

On October 3, 2017, the ALJ issued a decision denying Plaintiff's request for benefits. AR 128–47. On December 31, 2018, the Appeals Council granted Plaintiff's request for review, and it remanded for further proceedings.[2] AR 148–51. The ALJ conducted a second hearing on October 7, 2019, at which Plaintiff testified and was represented by counsel. AR 53–73. An impartial vocational expert testified at that hearing as well. *Id.* The ALJ issued a decision denying Plaintiff's request for benefits on November 20, 2019. AR 33–52. On May 21, 2021, the Appeals Counsel denied Plaintiff's request for review. AR 1–6. On that date, the ALJ's decision became the final decision of the Commissioner. 42 U.S.C. § 405(h). Plaintiff timely commenced this action in federal court.

### B.     Plaintiff's Testimony and Self-Reported Symptoms

At the time of his hearing, Plaintiff was a 57-year-old man who was born June 4, 1962. AR 329. He is married with four children. AR 77. His wife works for Union Bank. AR 56. He has an associate degree and attended a steamfitter and pipe fitter trade school. AR 1123. He most recently worked as a tax preparer between 2010 and 2012. AR 85. He stopped working in September of 2012 when he tore a ligament in his right arm. AR 86. He has previous work going back to 2002 as a maintenance technician (installing washers and dryers), and as a handyman. AR 86-91.

Plaintiff claims he is disabled based on both physical and mental problems. AR

---

[2] The Appeals Counsel remanded the proceedings, directing the ALJ to consider a post- hearing consultative report from Jeff Altman, M.D., AR 3432-3438, as well as the opinions from state disability non-examining sources. AR 149-150.

56.  His physical problems are primarily orthopedic, with lower back pain, right shoulder pain, and right arm pain.  AR 57.  He walks up to three times a week to stay mobile.  AR 58.  He stopped working as a tax preparer after he had surgery on his arm because he could not type anymore.  AR 59.  He spends most of his day sitting around the house and watching television.  He drives his son to school.  AR 60.  He uses a TENS machine and hot pads for pain control.  AR 61.  He says he can lift to five pounds and can stand for an hour before he needs to sit down.  AR 62.  He walks as much as possible, but always has pain.  AR 62-63.  He does the grocery shopping with his wife, but he carries the grocery bags in his left hand.  AR 63-64.   As for mental problems, he sees a psychiatrist and participates in group therapy.  AR 65.  He can shower and clothe himself and pick up his son from school.  AR 66.  He takes naproxen for pain in his back and shoulder.  AR 66-67.  His neurologist recommended back surgery, but he is afraid of the potential consequences of that and has not had surgery.  *Id.*

### C.   Medical Providers

Between September 2012 and the September 16, 2016, the date he was last insured, Plaintiff saw a variety of treating, examining, and consultant health care providers. The ALJ considered the evidence and opinions from each of these providers, including the opinions of state agency doctors S. Clancy, M.D. and Gideon H. Lowell, M.D., as directed by the Appeals Council. AR 43, 149-150.

### 1.  Jeffrey Bernicker, M.D. [Orthopedic Surgeon]

As the ALJ pointed out in his first decision, Plaintiff has a history of work-related orthopedic problems.  AR 134.  In 2007, he injured his cervical spine and right shoulder, AR 134, 1205, but subsequently returned to work doing plumbing, painting, and electric work.  *Id*.  On April 27, 2012, Plaintiff injured his right elbow.  *Id.*  Dr. Jeffrey Bernicker, an "Agreed Medical Examiner," to Plaintiff's 2007 worker's compensation case was asked to examine Plaintiff to determine whether the right elbow injury contributed to his earlier shoulder/cervical injury.  AR 1184-1205.  Dr. Bernicker determined that the two injuries were unrelated, and the elbow injury did not aggravate the earlier

shoulder/cervical injury.  AR 1205.  He was not asked to evaluate the right elbow injury itself and noted he would defer to Dr. Thomas Harris who did that evaluation for worker's compensation purposes.  *Id*.

### 2. **Virginia Maghsoudy, M.D.**

Dr. Maghsoudy saw Plaintiff on April 12, 2012, soon after his right elbow injury.  AR 1133.  She diagnosed him with right lateral epicondylitis/right elbow sprain/strain.  She prescribed naproxen and referred him to physical therapy for two weeks.  She opined Plaintiff could return to work on April 30, 2012, with limited use of the right hand, limited lifting, pulling, and pushing up to five pounds; he needed a splint and should not do any forceful grasping or twisting using the right hand or elbow.  *Id*.  Two weeks later, Dr. Maghsoudy saw Plaintiff again.  At that time Plaintiff complained of moderate to severe pain in his right elbow.  She ordered Tramadol and continued his work limitations.  *Id.*

### 3. **Dr. Minh Nguyen, D.O.**

On May 9, 2012, Plaintiff saw Dr. Nguyen with continuing complaints of right elbow pain.  AR 1133.  Plaintiff had stopped working because no modified duties were available.  *Id.*  Dr. Nguyen continued his pain medications and physical therapy.  *Id*.  Plaintiff saw Dr. Nguyen again on May 16, 2012.  AR 1133.  At that time, he noted Plaintiff had not improved, and physical therapy was not helping.  Dr. Nguyen recommended a steroid injection and continued limited duties.  *Id*.  On May 23, 2012, Plaintiff had another visit with Dr. Nguyen.  AR 1134.  At that time, Plaintiff reported sharp and moderately severe pain.  Dr. Nguyen continued with conservative care and work limitations as previously determined.  *Id.*

### 4. **Sion Nobel, M.D.**

Dr. Nobel conducted an Electromyography (EMG)/Nerve Conduction Velocity (NCV) study on Plaintiff on July 17, 2012.  AR 1134.  His impression was right global

brachial plexopathy with lower trunk medial cord brachial plexopathy.[3]

## 5.   Dr. James McClurg [Orthopedic surgeon]

Dr. James McClurg, an orthopedic specialist, took over management of Plaintiff's elbow injury on July 12, 2012.  He saw Plaintiff thirty-five (35) times between July 12, 2012, and October 13, 2014.  Dr. McClurg provided an "Orthopedic Consultation Report" to the workers' compensation insurer (Travelers).  AR 960-970.  He noted Plaintiff's chief complaint to be right elbow and forearm pain.  AR. 961.  Plaintiff told Dr. McClurg he injured his elbow while lifting a washing machine.  *Id*.  Upon examination and after performing provocative testing (AR 965), Dr. McClurg diagnosed right lateral epicondylitis, cubital tunnel syndrome, and PN carpal tunnel syndrome.[4]  Dr. McClurg observed that Plaintiff's elbow had not improved since the time of the incident. AR 966.  He also noted Plaintiff's job description as a "maintenance technician" involved physical demands such as standing, walking, stooping, twisting, turning, lifting, pushing, and pulling with lifting to 75lbs.  AR 962.  He ordered pain medication and fitted Plaintiff with an elbow brace and reduced his work duties as follows: "limited use of the right upper extremity, no repetitive overhead lifting or reaching, no repetitive pushing or pulling, gripping, grasping, rotate job tasks, five minutes of stretching for every hour of activities."  AR 968-969.  Dr. McClurg's prognosis at the time was "good."  AR 969.

Dr. McClurg saw Plaintiff again on July 27, 2012, at which time he requested authorization for a right elbow MRI.  AR 972-974.  At that visit, Plaintiff described his pain as moderate to severe with "waking up at night, weakness, numbness, tingling,

---

[3] The brachial plexus is a network of nerves that sends signals from the spinal cord to the shoulder arm and hand. www.mayoclinic.org/diseases/brachial-plexus-injury/symptoms-causes/syn-20350235. (June 23, 2020)

[4] Epicondylitis, commonly known as "tennis elbow," is the swelling of the tendons that bend the wrist back from the palm. It is caused by repeated motion of the forearm muscles and tendons. www.hopkinsmedicine.org. Cubital Tunnel Syndrome happens when the ulnar nerve that runs from your neck to your hand is irritated or compressed (squeezed) at the inside of the elbow. Cubital tunnel syndrome affects your pinky and ring finger while "carpal tunnel syndrome" affects your thumb, index finger and middle finger. www.clevelandclinic.org/health/diseases/21997-cutital-tunnel-syndrome. (October 25, 2021)

locking, popping, giving away, swelling, radiating to the fingertips." AR 972.

On August 30, 2012, Dr. McClurg saw plaintiff and reviewed the results of the MRI with him. AR 978-979. The MRI, dated July 27, 2012, indicated tendinosis of the common extensor tendon without tearing, and focal enlargement of the ulnar nerve within the cubital tunnel. AR 1071-1072. A subsequent MRI with contrast medium, dated August 23, 2012, showed "increasing inflammation and tear of the common extensor tendon," AR 1071, with a minimal ulnar attachment tear that was considered of doubtful significance. AR 1072. Dr. McClurg noted that Plaintiff's work accommodations should include limited use of the right upper extremity, no repetitive gripping or grasping, and a weight restriction to 30 lbs. AR 979.

Plaintiff saw Dr. McClurg again on September 20, 2012. AR 981-983. Dr. McClurg indicated that Plaintiff's recovery was slower than expected. AR 982. He recommended additional imaging, continued plaintiff's work restrictions, and requested authorization for physical therapy two times a week for three weeks. AR 982.

On October 12, 2012, Dr. McClurg saw Plaintiff and again observed that his condition had not improved. AR 984. He continued Plaintiff's course of treatment with pain medication, physical therapy, and the same work restrictions. AR 985-986.

At a visit on November 2, 2012, Dr. McClurg noted that Plaintiff still did not appear to be improving with the then-current line of treatment. AR 989. Dr. McClurg continued Plaintiff's course of treatment with pain medication, physical therapy, and the same work restrictions. AR 989.

During a visit on December 6, 2012, Dr. McClurg determined Plaintiff to be a surgical candidate as he had not improved with conservative care. AR 991. His new treatment plan included surgery described as a "right elbow extensor slide with lateral epicondylectomy.[5] AR 992.

---

[5] Lateral epicondylitis surgery is a procedure to alleviate the pain and inflammation caused by tennis elbow. It may include releasing a portion of the tendon from the bone, removing the inflamed tendon, and repairing tendon tears. www.orthovirigia.com/lateral-epcondylitis-surgery.

1    Dr. McClurg next saw Plaintiff on December 12, 2012.  AR 991-993.  At that time,

2  Plaintiff said his pain was "constant, aggravated by pushing, pulling, reaching, lifting, or

3  carrying heavy objects."  Dr. McClurg sought authorization to perform surgery on

4  Plaintiff's elbow.  AR 992.

5    On December 27, 2012, Plaintiff saw Dr. McClurg for a pre-operative evaluation.

6  AR 994-996.  Dr. McClurg noted Plaintiff's pain levels and functionality were not

7  improving and a request for surgery was pending.  AR 995.

8    Plaintiff had another visit with Dr. McClurg on January 10, 2013.  AR 997-999.

9  At that time, Dr. McClurg noted that surgical authorization was still pending, and that

10  Plaintiff's symptoms had not improved.  AR 998.

11    On January 31, 2013, Plaintiff again saw Dr. McClurg.  AR 1000-1002.  At that

12  visit, Dr. McClurg told Plaintiff the request for surgical authorization had been denied.

13  AR 1000.  Dr. McClurg considered this decision "inappropriate since [the] patient is

14  quite symptomatic, has significant limitation in overall functioning, and has failed to

15  respond to conservative measures."  Id.  Dr. McClurg said he made a request for

16  reconsideration as "patient has had full extend (sic) of conservative care for this

17  condition, including medications, activity modifications, tennis elbow bracing, physical

18  therapy and lateral epicondylar injection; he has had a positive MRI confirming

19  diagnostic impression of lateral epicondylitis; his physical findings are confirmatory."

20  AR 1001.

21    Dr. McClurg's next visit with Plaintiff was on February 21, 2013.  At that time,

22  Plaintiff said his pain as "sharp, stabbing, throbbing and pulsating," with the duration of

23  pain as "constant."  AR 1003.  Dr. McClurg noted that surgery on plaintiff's elbow had

24  now been authorized.  AR 1005.  He was to remain off work until the next evaluation.

25  AR 1006.

26    On March 12, 2013, Dr. McClurg operated on Plaintiff's elbow.  AR 1007.  A

27  post-operative appointment followed on March 15, 2013.  AR 1007.  At that time, Dr.

28  McClurg noted that there was no evidence of infection, and no motor or sensory deficits.

AR 1010.  He was to continue with pain medication and remain off work until his next visit.  AR 1010.

At a visit on March 22, 2013, Dr. McClurg advised Plaintiff to decrease his narcotic medication (due to side effects) and to begin a program of physical therapy.  AR 1013.  He was to remain off work.  AR 1013.

Dr. McClurg saw Plaintiff again on April 14, 2013.  AR 1015-1016.  Dr. McClurg noted Plaintiff continues to use pain medications and he is still in mild to moderate constant pain.  *Id.*  He also observed that physical therapy was benefitting Plaintiff. Dr. McClurg increased his physical therapy to three times a week for the next four weeks. AR 1016. He was to remain off work.  AR 1016.

Plaintiff's next visit with Dr. McClurg was on May 20, 2013.  Dr. McClurg noted that plaintiff still has frequent pain that is "aching, stabbing, pins and needles."  However, he also observed that surgery improved Plaintiff's pain by 30%-40%.  AR 1018. Nevertheless, Dr. McClurg considered his recovery to be "slower than what I expected." AR 1019.  He was told to remain off work until the next evaluation."  AR 1020.

Dr. McClurg saw Plaintiff again on June 10, 2013.  AR 1021-1023.  At that time, Plaintiff described his pain as sharp and radiating to the upper arm.  However, because therapy continued to help, Dr. McClurg extended his therapy.  AR 1022.  At this visit, Dr. McClurg indicated that Plaintiff needed work accommodations with limited use of the right upper extremity, no pushing or pulling, no gripping or grasping, weightlifting restricted to 5 lbs.  AR 1022.

At the next visit on July 3, 2013, Dr. McClurg again noted that Plaintiff's recovery was slower than expected, AR 1025, although surgery had reduced Plaintiff's pain 40%-50%.  AR 1024.  Dr. McClurg also reported that physical therapy is helping.  His work restrictions remained the same.  AR 1025.

The next visit was on August 2, 2013. AR 1027-1029.  Dr. McClurg noted that his request for additional therapy for Plaintiff was denied, but he had requested reconsideration.  AR 1028.  A request for a "Qualified Medical Examination" had been

approved as had further diagnostic testing.  *Id.*  Plaintiff's work restrictions remained the same.  *Id.*

Dr. McClurg saw Plaintiff again on September 5, 2013.  At that time, Dr. McClurg had a copy of a report from Dr. Thomas W. Harris, a Qualified Medical Examiner.  AR 1117-1129.  Dr. McClurg felt he needed further review of Plaintiff's past treatment records to formulate a treatment plan going forward.  AR 1031.  Plaintiff's work restrictions remained the same.  AR 1032.

On September 18, 2013, Dr. McClurg had another visit with Plaintiff.  AR 1033-1035.  He noted that Plaintiff's condition was not showing improvement.  AR 1033.  Imaging results from August 18, 2013, indicated improving chronic common extensor tendinosis with persistent collection of fluid along the anteromedial elbow joint in the vicinity of an otherwise normal appearing ulnar nerve.  AR 1034.  There were no other abnormal findings.  *Id*.  Plaintiff's work restrictions continued to be described as limited use of the right upper extremity, no pushing or pulling, no gripping or grasping, weightlifting restricted to 5 lbs.  AR 1034.

Dr. McClurg next saw Plaintiff on September 23, 2013.  At that time, he noted Plaintiff's pain had improved 50%-60%.  AR 1036.  However, he continued Plaintiff on narcotic pain medication and kept the same work restrictions.  AR 1036-1037.

On October 17, 2013, Plaintiff again saw Dr. McClurg.  AR 1039-1041.  Dr. McClurg noted that despite being on pain medication, Plaintiff continues to have constant pain that is burning and aching.  AR 1039.  He further observed that "Plaintiff has a stable chronic orthopedic condition with a stable baseline pain and function."  AR 1040.  He recommended judicious use of medications, self-directed home exercise program with light exercise.  *Id.*  His work restrictions remained the same.  *Id.*

On November 19, 2013, Dr. McClurg saw Plaintiff again.  AR 1042-1044.  At that time, a supplemental Qualified Evaluation Report (QME) was pending.  At this visit, Dr. McClurg modified Plaintiff's work restrictions to increase the weightlifting restriction to 40lbs.  AR 1043.

1

Dr. McClurg saw Plaintiff on December 16, 2013.  AR 1045-1047.  He noted that

2

Plaintiff continued to use pain medication and has constant mild to moderate pain.  AR

3

1045.  His work restrictions remained the same.  AR 1046.

4

Dr. McClurg next saw Plaintiff on January 13, 2014.  He noted that pain

5

medications continued to help, but Plaintiff reports constant pain that is "aching and

6

stabbing."  AR 1048.  Dr. McClurg prescribed a program of acupuncture in addition to

7

continuing his medications.  AR 1049.  His work restrictions remained the same.  *Id.*

8

On February 17, 2014, Plaintiff saw Dr. McClurg again.  AR 1051-1053.  At that

9

time Dr. McClurg noted acupuncture was authorized.  Plaintiff's work restrictions

10

remained the same.  AR 1052.

11

On March 10, 2014, Dr. McClurg saw plaintiff again.  AR 1054-1055.  Plaintiff

12

reported a good response to acupuncture.  Dr. McClurg extended his authorized

13

acupuncture.  AR 1055.  Dr. McClurg also noted he was expecting a QME report from

14

Dr. Harris.  *Id.*  Plaintiff's work restrictions remained the same. AR 1052.

15

Dr. McClurg next saw plaintiff on April 7, 2014.  AR 1057-1059.  At that time, he

16

had a copy of Dr. Harris' report.  He again noted that Plaintiff has a stable chronic

17

orthopedic condition with a stable baseline pain and function.  He recommended

18

continuing the current line of treatment with pain medication and acupuncture.  AR 1058.

19

Dr. McClurg next saw Plaintiff May 5, 2014.  At that time, he noted chronic pain is

20

stable with fluctuations, and current treatment should be continued.  AR 1060.  His work

21

status was noted "as per QME."  AR 1061.

22

Dr. McClurg next saw Plaintiff on June 5, 2014.  AR 1066-1068.  At that visit, Dr.

23

McClurg noted that Plaintiff said his medications were not providing sufficient pain

24

relief.  AR 1064.  Dr. McClurg increased Plaintiffs "Norco" to three times per day.  *Id.*

25

Plaintiff saw Dr. McClurg again on July 3, 2014.  AR 1066-1068.  Dr. McClurg

26

noted that Plaintiff was not getting enough pain relief from current medications, so he

27

prescribed topical pain medications as well.  AR 1067.

28

On August 28, 2014, Dr. McClurg saw Plaintiff for right shoulder pain and low

back pain.  AR 1253-1255.  He reviewed a cervical MRI scan from October 9, 2007, and a lumber MRI from April 2, 2014.  AR 1254. He noted that Plaintiff has a chronic orthopedic condition for which he has reached a stable baseline.  He observed that current management allows for a satisfactory functional capacity.  AR 1255.

Dr. McClurg saw Plaintiff on September 12, 2014, for right shoulder and low back pain.  AR 1257-1259.  He complained of constant pain in his low back with radiating pain in the right thigh as well as continued symptoms in the right shoulder/arm.  AR 1257.  Dr. McClurg noted the conclusions from EMG testing by Dr. Andrew Bullock, D.O. which showed no electrodiagnostic evidence of lumbar radiculopathy or lower extremity motor neuropathy.  AR 1258, but there is evidence consistent with lower extremity sensory polyneuropathy.  *Id.*  He noted that work restrictions are "as A.M.E." AR 1259.

On October 13, 2014, Dr. McClurg again saw Plaintiff for low back pain and shoulder pain.  AR 1261-1263.  Plaintiff stated that the pain is constant, and he wants better pain control.  AR 1259.  Dr. McClurg adjusted Plaintiff's pain medications and continued to note his work status as "per A.M.E."  AR 1263.

### 6.  Dr. Thomas W. Harris [Orthopedic Surgeon, Worker's Compensation Appeals Board]

Dr. Thomas Harris saw Plaintiff for a "Panel Qualified Medical Examination" on Plaintiff July 9, 2013.[6]  AR 1117-1129.  At that visit, Dr. Harris noted Plaintiff was taking Vicodin, naproxen, and omeprazole for pain as needed.  AR 1123.  On examination of the right elbow, he had tenderness about the flexor muscle group of the forearm and tenderness over the lateral epicondyle.  *Id*.  His range of motion was normal as was his muscle strength.  AR 1123-1124.  He had positive signs for tennis elbow.  AR 1124.  Examination of the right wrist revealed normal range of motion, muscle, and grip strength as well as normal sensation.  AR 1125.  He had a negative Tinel's sign over the

---

[6] The QME took place approximately four months after Plaintiff's elbow surgery on March 12, 2013. AR 1007.

median nerve, a negative Phalen's sign, a negative Adson's test, and a negative Finkelstein's test. *Id.* In Dr. Harris's opinion, Plaintiff had reached a level of maximum medical improvement for his industrial injury. AR 1125. He gave Plaintiff a 20% upper extremity impairment and a 12% whole person impairment. AR-1126.

Dr. Harris opined that, as of that date, Plaintiff had reached a plateau following his elbow surgery and he is unlikely to change with or without medical treatment. AR 1127. He did note that Plaintiff has residual symptoms involving lateral epicondylitis and ulnar neuritis. These symptoms are exacerbated when he is speaking on the telephone which places his elbow in extreme flexion and while resting his elbow on a hard surface. AR 1127. He recommended a padded elbow sleeve and a tennis elbow strap. AR 1128.

Dr. Harris saw and reevaluated Plaintiff on February 4, 2014. AR 1132-1139. At that time, Plaintiff complained of frequent sharp-stabbing-shooting-throbbing right elbow pain. He rated his pain at a 7 out of 10. AR 1132. Plaintiff said his pain increases with lying, lifting, carrying, pulling, pushing, gripping, grasping, writing, typing, and driving. AR 1132. After reviewing Plaintiff's treatment history and job duties as a maintenance technician, Dr. Harris examined Plaintiff's elbow and hand. He found normal range of motion and strength in the right arm with certain special exams (Tinel's and Cozen's) showing positive signs for tennis elbow. AR 1137. He noted he was asked to determine appropriate work restrictions for Plaintiff and asked to compare them to those of Dr. McClurg. AR 1138. However, at the time of the examination, he had not been provided with Dr. McClurg's work restrictions so he said he would provide a supplemental report addressing work restrictions. *Id.*

### 7. Dr. Jeff Altman [Orthopedic Surgeon]

Dr. Jeff Altman, an Orthopedic Consultant, saw Plaintiff on August 10, 2017, for right upper extremity pain and low back pain. AR 3432-3438. At that time, Plaintiff described his back pain as sharp, dull, throbbing, burning with radiation down the right leg. AR 3432. He was not receiving any treatment other than medications. *Id.*

Dr. Altman reviewed Plaintiff's MRI scans and medical records from Drs.

1   McClurg and Bullock.  AR 3433.  His orthopedic examination of the right upper
2   extremity revealed no tenderness to palpation and full pain-free range of motion with a
3   negative "Tinel's" sign.  AR 3435.  As for the right lower extremity, Plaintiff had full
4   pain-free range of motion in the hip, knee, ankle, and foot.  *Id.*  Plaintiff had full motor
5   strength in the right upper extremity and the lower extremity.  *Id.*  Sensation was intact in
6   both the upper and lower extremity (in the L1-L-2 distribution).  *Id.*  He had normal
7   pulses in both the upper and lower extremity.  AR 3437.

8       Dr. Altman diagnosed multilevel lumbar disc disease with status post right
9   shoulder surgery and right elbow lateral epicondyle surgery.  *Id.*  His functional
10  assessment at that time was as follows (AR 3438): he can lift and carry 20 pounds
11  occasionally and 10 pounds frequently.  He can stand and walk six hours in an eight-hour
12  workday.  He can sit six hours out of an eight- hour day.  He can bend, crouch, kneel,
13  crawl, or stoop frequently.  He should avoid overhead activity on the right but can
14  perform overhead activity on the left without restrictions.  He can frequently use both
15  hands for fine and gross manipulation, and he needs no assistive device for walking.  *Id.*

### 8.  Dr. Robert Thompson [Orthopedic Surgeon]

17      Dr. Thompson is an orthopedic specialist who testified at Plaintiff's first
18  administrative hearing, June 12, 2017.  AR 79-84.  He testified that there was some
19  evidence of sensory impairment in the right hand that might be considered severe as well
20  as some evidence of low back of an L5 S1 pars defect, but he had insufficient evidence at
21  that time of Plaintiff's functional status to give an opinion as to his residual functional
22  capacity.  AR 81-82.  He recommended a consulting examination with an orthopedic
23  surgeon to fully clarify the record.  *Id.*

### 9.  Dr. Gregory M. Nicholson [Psychiatrist]

25      On November 15, 2014, at the request of the Social Security Administration,
26  Plaintiff saw Dr. Nicholson for a Comprehensive Psychiatric Examination.  AR 1268-
27  1273.  His chief complaint at that time was depression.  AR 1268.  He said he was feeling
28  depressed about his physical pain.  *Id.*  His symptoms included irritability, insomnia,

decreased appetite, decreased energy, trouble concentrating and decreased interest in normal activities.  AR 1268-1269.  He did not feel suicidal, and he was not regularly seeing a psychiatrist.  AR 1269.  Dr. Nicholson noted that Plaintiff completed high school and earned an associate degree.  AR 1269.  Plaintiff outlined his activities of daily living as follows: he lives with his wife; she does the cooking; he does the laundry; he drives his own car; he has no difficulty dressing, bathing, or with his hygiene; he handles bills and cash appropriately and can go out on his own.  AR 1270.  Dr. Nicholson observed Plaintiff to be neatly and casually groomed; he made good eye contact and was generally cooperative.  AR 1270.  He appeared genuine and truthful.  There was no evidence of manipulation.  *Id.*  Dr. Nicholson noted that Plaintiff's thought process was coherent and organized and there was no bizarre or delusional thought content.  Plaintiff denied any recent auditory or visual hallucinations.  *Id.*

Plaintiff's mood and affect at that time was depressed.  AR 1271.  He was tearful and dysphoric (unhappy).  His speech was normal and clearly articulated.  *Id.*  He could recall three items immediately and two items after five minutes and three items with hints.  *Id.*  He was able to spell "world" both forward and backward.  *Id.*  He was able to perform serial threes and solve a simple math problem.  *Id.*

Dr. Nicholson's functional assessment of Plaintiff was as follows:

- Plaintiff can understand, remember, and carry out simple one or two-step instructions and he can do detailed and complex instructions.

- Plaintiff is capable of handling funds.

- Mild limitations in ability to relate and interact with co-workers and the public.

- Mild limitations in ability to maintain concentration and attention, (persistence and pace is not limited)

- Mild limitations in ability to accept instructions from supervisors.

- No limitations in ability to maintain regular attendance in the workplace and perform work activities on a consistent basis.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- • No limitation in ability to perform work activities without special or additional supervision.

AR 1272.

Dr. Nicholson assessed Plaintiff's prognosis as "good."  He expected Plaintiff to improve over the next twelve months with active treatment.  *Id*.

### 10. Dr. Alan Berkowitz, M.D., and G. Johnson [State consultants]

Dr. Berkowitz, a state consulting psychiatrist, opined on September 2, 2014, that Plaintiff did not have a severe mental impairment.  AR 105.  He observed that Plaintiff's primary physician noted on nine visits that Plaintiff's mood and affect were within normal limits.  *Id*.  He also observed that Plaintiff was not on any psychiatric medications.  *Id*.

On reconsideration, Dr. Johnson, confirmed Dr. Berkowitz' assessment of September 2, 2014, and agreed that Plaintiff's alleged mental disorder remains non-severe.  His alleged psychiatric symptoms significantly exceed the objective evidence found in the medical records and the consulting examination.  AR 119-120.

### 11. County Mental Health/South Bay (Dr. Nydia Valverde)

On November 24, 2014, Plaintiff had a Behavioral Health Assessment at San Diego County Mental Health Services at the recommendation of the SSA.  AR 2289.  At that time, he presented with the following symptoms (AR 2289): "irritability, mood swings and anger towards others.  He hears a voice calling his name where there is none. His symptoms started about a year ago and get worse by the pain medication he is on.  He is on Vicodin, oxycodone, tramadol, and naproxen.  He is going to a chiropractor to try to get off the pain meds.  He has thoughts of hurting others when he is on the medications, but he has never acted on those thoughts."  *Id*.  The examiner noted that Plaintiff has had chronic pain condition since 2007 for which he takes multiple pain medications.  At that time, the examiner judged him not to be a danger to himself or others.  AR 2294-2295. His mental status examination indicated he was "alert," "oriented," "disheveled," "coherent," "cooperative," of "average intellect," "depressed," "normal memory,"

"slowed motor," "fair judgment," "fair insight," "auditory hallucinations," and "visual hallucinations" (shadows).  AR 2301.  The examiner diagnosed Plaintiff with major depression (single episode, severe).  AR 2314.  Plaintiff reported he is covered with Kaiser and would be seeking his psychiatric care there.  AR 2319.

### 12.  Lily Chiang, M.D. [Kaiser Permanente, Psychiatrist]

Dr. Chang treated Plaintiff at Kaiser beginning in January 2015.  AR 1275.  She diagnosed him with depression and anxiety.  *Id*.  She noted that he reports symptoms of low mood, anxiety, irritability, crying spells, poor sleep, bad dreams, helplessness, fatigue, social isolation, and suicidal thoughts all of which are affected by his pain medication and life stressors.  She said he is currently participating in medical management appointments and an intensive outpatient program.  *Id.*

On March 1, 2017, Plaintiff saw Dr. Chiang at Kaiser.  He reported that he was adequately managing his depressive and anxiety symptoms.  AR 3357.  She noted his flow of thought was linear, logical, and goal-directed; he denied any current hallucinations or delusions, his mood was "pretty good;" his affect mildly constricted but stable, his intellect alert and grossly oriented and his insight/judgment limited to fair.  *Id.* Dr. Chiang concluded he does not present as someone with a primary psychotic disorder even though he reports hearing things.  She did not find any evidence of internal stimuli, thought disorder, disorganized speech/behavior, or delusions.  *Id.*  She suggested that he take the Minnesota Multiphasic Personality Inventory (MMPI), but he declined, saying "I'm pretty good; I know how to relax, I know how to get through my problems."  *Id.* She assessed him as a low risk of imminent danger to himself or others and found his condition "stable."  *Id.*  Group outpatient counseling records from Kaiser on March 23, 2017, are consistent with Dr. Chiang's report in that they indicate Plaintiff is maintaining progress; has no suicidal thoughts or ideation, is complying with his medication and continues doing walks with his wife.  AR 3398.

//

### C.   Vocational Expert Testimony

### 1.  Dr. Mary Jesko

A vocational expert, Dr. Mary Jesko, testified at the first administrative hearing. AR 91-96.[7]  Dr. Jesko testified that Plaintiff's prior work as building maintenance repairer, code 899.381-010[8] would be considered medium, skilled, SVP 7.[9]  And construction work is 869.664-014.  It is generally performed at heavy, semi-skilled, SVP 4.  AR 91.  His prior work as a tax preparer falls in a "data entry clerk" category, sedentary, semi-skilled SVP 3.  *Id*.  That code is 203.382-034.  When asked if there were any lighter occupations to which Plaintiff's skills could transfer, she said that airport maintenance is considered a "light" maintenance occupation, SVP 7, and there are approximately 28,000 jobs nationally in that category.  AR 94-95.

### 2.  Mark Remas

Mr. Mark Remas testified as a vocational expert at the second administrative hearing. AR 68-71.[10]  At that time the ALJ engaged in the following colloquy with Mr. Remas:

> Q: Mr. Remas, assume a hypothetical individual the Claimant's age, education, and prior work experience.  Assume this person could lift or carry 20 pounds occasionally; 10 pounds frequently; could stand or walk 6 hours out of an 8-hour day; could sit 6 hours out of an 8-hour day with normal breaks. No reaching or lifting above the head with the right, [dominant] upper extremity.  No limitation with the non-dominant upper extremity. And gross or fine manipulation with the dominant hand is frequent. No limitation on the non-dominant upper extremity.  Could such a hypothetical individual perform any of Claimant's past work?
>
> A: Yes, Your Honor, the tax preparer, which is sedentary work, would be within

---

[7] Dr. Jesko has a doctorate degree in Education and practices as a certified rehabilitation counselor and certified disability management specialist with over 30 years' experience.  AR 518-520.

[8] The "codes" referred to by the vocational expert refer to the Dictionary of Occupational Titles (DOT), U.S. Department of Labor-Fourth Edition, Revised. 1991.

[9] To determine the skill level of various jobs, the SSA uses a Specific Vocational Preparation (SVP) rating.  The rating indicates how much time it takes for a worker to learn a job. An SVP rating of 3 translates to up to three months training to learn the job. SSA Grid Rules: Understanding Specific Vocational Preparation. https://disabilityqualification.com (June 10, 2021).

[10] Mr. Remas has a master's degree in educational psychology, counseling, and guidance.  He has worked in vocational rehabilitation and evaluation for over 35 years. AR 536-537.

that hypothetical, and it requires handing and fingering frequently and could accommodate the overhead-reaching restriction with the right, upper extremity.

Q: All right. Hypothetical 2, assume a hypothetical individual, the same restrictions as in 1; however, the handling with the dominant, upper extremity, the handling would be occasional; the fingering would be frequent. So occasional handling and frequent fine fingering. Does that eliminate the tax preparer job?

A. Yes, it does. It requires frequent handling and frequent fingering.

Q: Okay. And is there other work such a hypothetical individual could perform?

A. Yes, Your Honor, there'd be other work that would be available at an unskilled level. It would not be based on transferable skills. Examples of other work would include a children's attendant; 349.677-018; SVP is 2, unskilled. It is light. 65,000 in that classification. Another example would be a milk (mill) stenciler. That is 659.685-026; SVP 2; unskilled; light. 65,000 in that one.

Q: What's a mill stenciler do?

A: . . . tends a machine that prints identifying data on fabricated pipe. . . Next is a bakery worker on a conveyor line; 524.687-022; SVP 2; unskilled. It is light; 45,000.

Q: Does your testimony differ from the <u>Dictionary of Occupational Titles</u>?

A: No, it does not. Each of these are either occasional handling or occasional fingering or never on either of those two elements.

Q: . . . And hypothetical 3, assume a hypothetical individual, same restrictions as in [hypothetical] 2 This person would be off task more than 15% of the day due to pain. Any work?

A. No, Your Honor. That would rule out all work.

AR 68-70. Plaintiff's attorney then asked the following question:

BY ATTORNEY:

Q: Would there be any work for a person that's missing work twice a month due to their physical pain?

A.  No, there would be no work.

A. And Your Honor, on the hypothetical 3 and 4, that's not in the DOT.  That's based on my individual research on these topics, as well as over 40 years' experience analyzing jobs and productivity standards for employment.

AR 70-71.

## II.    THE ALJ DECISION

### A.    The Sequential Process

To qualify for disability benefits under the Social Security Act, an applicant must show that he or she cannot engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at least twelve months.  42 U.S.C. §§ 423(d), 1382(c)(a)(3).  The Social Security regulations establish a five-step sequential evaluation to determine whether an applicant is disabled under this standard.  20 C.F.R. §§ 404.1520(a), 416.920(a); *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1194 (9th Cir. 2004).

At step one, the ALJ determines whether the applicant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(b).  If not, then at step two the ALJ must determine whether the applicant suffers from a severe impairment or a combination of impairments.  *Id.* §§ 404.1520(a)(4)(ii), 416.920(c).  If the impairment is severe, at step three the ALJ must determine whether the applicant's impairment or combination of impairments meets or equals an impairment contained under 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.* §§ 404.1520(a)(4)(iii), 416.920(d).  If the applicant's impairment meets or equals a listing, he or she must be found disabled.  *Id.*

If the impairment does not meet or equal a listing, the ALJ must determine the applicant's residual functional capacity ("RFC"). [11]   20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(e). Then, the ALJ must determine at step four whether the applicant retains the

---

[11] A claimant's residual functional capacity ("RFC") is the most he can still do in a work setting despite impairments. See, 20 C.F.R. § 404.1545(a).

residual functional capacity to perform past relevant work. *Id.* §§ 404.1520(a)(4)(iv), 416.920(f).  If the applicant cannot perform past relevant work, at step five the ALJ must consider whether the applicant can perform any other work that exists in the national economy. *Id.* §§ 404.1520(a)(4)(v), 416.920(g).

The applicant carries the burden to prove eligibility from steps one through four but the burden at step five is on the agency. *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).  Applicants not disqualified at step five are eligible for disability benefits. *Id.*

## B.    Substance of the ALJ's Decision

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from his alleged disability onset date of April 27, 2012, through his last insured date of September 20, 2016.  AR 39.

At step two, the ALJ determined Plaintiff had the following severe impairments: multilevel degenerative disc disease of the lumbar spine; right shoulder impingement status-post surgery; and right elbow impingement status-post right elbow lateral epicondyle surgery.  AR 39.  The ALJ determined that those listed medically determinable impairments significantly limited the ability to perform basic work activities as required by SSR 85-28.  The ALJ further found that the claimant's medically determinable mental impairment of "depressive disorder" did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and was therefore not severe.  AR 39.

At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  AR 49.  Specifically, the ALJ found that Plaintiff did not meet or medically equal Listings 1.02 or 1.04 for major disfunction of a joint or for the requisite nerve root compression, spinal arachnoiditis or lumbar spinal stenosis.  Further the ALJ found the evidence did not show that Plaintiff's back disorder results in an inability to ambulate effectively. *Id.*

Next, the ALJ determined that Plaintiff retained the RFC to perform less than the

1  full range of light work as defined in 20 C.F.R. § 404.1567(b) in that:

2
3          The claimant can lift and carry 20 pounds occasionally and 10 pounds
           frequently.  He can stand and/or walk for six hours out of an eight-hour day;
4          can sit for six hours of an eight-hour day with normal breaks; cannot reach
           above the head with the dominant right upper extremity; has no limitation
5          with the non-dominant upper extremity; and gross or fine manipulation with
           the dominant hand is frequent, while there is no limitation on the non-
6          dominant upper extremity.

7  AR 40.  In making his RFC assessment, the ALJ noted he had considered all of Plaintiff's

8  symptoms along with the objective medical evidence and opinion evidence in the record.

9  *Id.*

10         At step four, the ALJ determined that Plaintiff could perform his past relevant

11 work as a tax preparer, Dictionary of Occupational Titles code 219.362-070, which is

12 performed at a sedentary exertion level and is semiskilled with a specific vocational

13 preparation of four.  This work does not require performance of work-related activities

14 precluded by the claimant's residual functional capacity.  AR 45-46.  The ALJ further

15 determined that Plaintiff is unable to perform his other past work as a pipe fitter, building

16 maintenance repairer, and construction worker as those jobs require heavy or medium

17 exertion which is beyond his capabilities. AR 45.

18         In sum, the ALJ found Plaintiff was not disabled as defined in the Social Security

19 Act as any time from April 27, 2012, the alleged onset date, through September 3, 2016,

20 the late last insured.  AR 45-46.

21    **III.   LEGAL STANDARD OF REVIEW**

22         The Social Security Act provides for judicial review of a final agency decision

23 denying a claim for disability benefits.  42 U.S.C. § 405(g).  A reviewing court will set

24 aside a denial of benefits only when the ALJ decision is "based on legal error or not

25 supported by substantial evidence in the record."  *Trevizo v. Berryhill*, 871 F.3d 664, 675

26 (9th Cir. 2017) (*quoting Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir.

27 2003)).  Substantial evidence is "more than a mere scintilla" and means "such relevant

28

evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *see Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (quotation and citation omitted).  It is a "highly deferential" standard of review.  *Valentine v. Astrue*, 574 F.3d 685, 690 (9th Cir. 2009).  However, the Court must consider the entire record, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and it "may not affirm simply by isolating a specific quantum of supporting evidence."  *Garrison v. Colvin*, 759 F3d. 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir. 2007)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  *Vasquez v. Astrue*, 547 F.3d 1101, 1104 (9th Cir. 2008) (internal quotations and citation omitted).  If the evidence is susceptible to more than one reasonable interpretation, the agency's decision must be upheld.  *Molina*, 674 F.3d at 1111.  It is not the Court's role to reinterpret or re-evaluate the evidence, even if a re-evaluation may reasonably result in a favorable outcome for the plaintiff.  *Batson*, 359 F.3d at 1193.  Moreover, the Court may not uphold an ALJ's decision on a ground not actually relied on by the ALJ.  *Molina*, 674 F.3d at 1121.

## IV.   DISCUSSION

Plaintiff argues that the ALJ erred in three respects: (1) the ALJ's finding that Plaintiff can perform his past relevant work as a tax preparer is not supported by substantial evidence, (2) the ALJ failed to adjudicate periods of time with different functional limitations separately, and 3) The ALJ did not assess plaintiff's mental ability to perform semi-skilled work as opposed to the basic requirements of work.  The Court will address each of these arguments in turn.

//

### A. **The ALJ's Finding that Plaintiff Can Perform His Past Relevant Work Is Supported by Substantial Evidence.**

At step four of the sequential evaluation process, the ALJ determined Plaintiff can

perform his past relevant work as a tax document preparer because it is performed at a "sedentary" exertional level and does not require performance of work precluded by Plaintiff's residual functional capacity ("RFC").  AR 44-45.  In making that finding, the ALJ relied on the testimony of the vocational expert (VE) who testified at the second hearing. AR 68-71. The ALJ asked the VE to assume a hypothetical person with Plaintiff's age, education, and prior work experience.  AR 68.  He then asked the VE to assume that person could lift or carry 20 pounds occasionally; 10 pounds frequently; could stand or walk 6 hours out of an 8-hour day; could sit 6 hours out of an 8-hour day with normal breaks; [n]o reaching or lifting above the head with the right, [dominant] upper extremity; [n]o limitation with the non-dominant upper extremity; [a]nd gross or fine manipulation with the dominant hand is frequent. No limitation on the non-dominant upper extremity.  *Id.*  The ALJ then asked the VE whether such a hypothetical individual person could perform any of Plaintiff's past work. The VE answered in the affirmative, specifically he said, "the tax preparer, which is sedentary work, would be within that hypothetical, and it requires handling and fingering frequently and could accommodate the overhead-reaching restriction with the right, upper extremity." AR 69.

Plaintiff does not challenge the VE's testimony as it relates to Plaintiff's ability to utilize his right arm and hand.  Rather, Plaintiff argues that a person who is limited to sitting six hours out of an eight-hour day cannot perform the same work Plaintiff did as a tax preparer which is sedentary work that required him to sit most or all the time.  ECF 12 at 11.  Because "sedentary work" as defined in the DOT does not include a two-hour break from sitting, Plaintiff contends there is an apparent conflict between the DOT and the VE's testimony which the ALJ failed to reconcile.  *Id.* at 11-12.

Where the VE's opinion and testimony "conflicts with, or seems to conflict with, the requirements listed in the Dictionary, then the ALJ must ask the expert to reconcile the conflict before relying on the expert to decide if the claimant is disabled." *Gutierrez v. Colvin*, 844 F.3d 804, 807 (9th Cir. 2016).  "For a difference between an expert's testimony and the Dictionary's listings to be fairly characterized as a conflict, it must be

obvious or apparent." *Id.* The Ninth Circuit has further expounded that "[t]his means that the testimony must be at odds with the Dictionary's listing of job requirements that are essential, integral, or expected." *Id.*

Here, there is no such apparent conflict that the ALJ had to resolve. The definition of sedentary work contemplates six hours of sitting in an eight-hour day. SSR 83-10 ("Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday."). Title 20 C.F.R. § 404.1567(a) states:

> Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

*Id*.

This is consistent with the vocational expert's testimony and the ALJ's RFC finding. SSR 83-10; 20 C.F.R. § 404.1567. Furthermore, there is no conflict with the DOT because VEs can testify whether a particular applicant for disability can perform subcategories of jobs within the DOT. ECF 15 at 9-10 (citing *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995)). Moreover, Plaintiff's work history form submitted to the Social Security Administration, indicates that in his actual job as a tax preparer he could both walk and stand in his workday. AR 466.

Therefore, the Court finds the ALJ properly relied on the expert testimony of the VE, finding that Plaintiff has the RFC to perform his past relevant work as a tax preparer, and finds no error on this ground. *Bayless v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005).

**B. The ALJ Erred in Giving "Little Weight" to Opinions of Drs. Magshoudy, McClurg, and Harris**

Plaintiff contends the ALJ erred by not separately considering the opinions of certain treating and consulting doctors as to Plaintiff's capabilities during a discrete period from April 2012 through July 2013.  ECF 12 at 13-15.

To support this argument, Plaintiff cites *Woods v. Kijacki*, 32 F. 4th 1108 (9th Cir. 2022) for this proposition.  However, another recent case from the Ninth Circuit is more on point.  *See Smith v. Kijacki,* 14 F. 4th 1108 (9th Cir. 2021).  *Smith* was a mental health case in which the claimant suffered a severe grief reaction to the deaths of his fiancée, mother, and grandmother during a two-month period in 2012.  *Id.* at 1110.  The record showed the claimant's symptoms varied during the years following his family members' deaths, but dramatically improved during the later years of the disability period.  *Id.*  The ALJ found that Smith was not disabled, but the Ninth Circuit reversed and remanded.  It held that the ALJ erred in disregarding Smith's subjective testimony because she only focused on those symptoms he testified to at the hearing in 2018, rather than symptoms that may have rendered him disabled during an earlier period after the deaths.  *Id*. at 1111-1113.  The court noted "it may be that Smith was disabled for a qualifying portion of the time from his alleged onset date, even if not for the full period." *Id.* at 1114.  The court also held the ALJ erred in discrediting the opinions of two doctors who examined Plaintiff shortly after the deaths of his loved ones, finding that those opinions may be unreliable as to Smith's condition over the whole five- year period covered by the Smith's claim, but that does not mean they were unreliable during the earlier period.  *Id.*

The issue here is whether Plaintiff was disabled from performing his past relevant work as a tax preparer for a qualifying portion of the time from his alleged onset date, even if not for the full period.  Neither party cites *Smith* or its applicability to this case.  Rather, the Commissioner argues the ALJ is only required to assess Plaintiff's disability from his alleged onset date to the date he was last insured, September 2016.  ECF No. 15 at 10.  But that argument cannot be squared with *Smith.*  Here, Plaintiff's treating physicians, Drs. Maghsoudy and McClurg, opined that Plaintiff's use of his right, dominant hand and arm were seriously limited, at least from April 2012 through July

2013.  For example, on April 12, 2012, soon after Plaintiff's injury, Dr. Maghsoudy diagnosed him as having a right elbow sprain, and she restricted his work activity to limited use of the right hand, limited lifting, pulling, and pushing up to five pounds; no forceful grasping or twisting using the right hand or elbow.  AR 1133.

Dr. McClurg, an orthopedic specialist, treated Plaintiff numerous times between July 2012 and July 2013.  He began with conservative treatment, but by December 2012, he determined Plaintiff needed surgery on his right elbow.  AR 991-992.  He performed that surgery in March of 2013.  AR 1007.  Over the course of the next few months, Dr. McClurg noted that Plaintiff's pain levels and functionality slowly improved.  AR 1018-120.  By June 2013, Dr. McClurg determined Plaintiff needed work accommodations with limited use of the right upper extremity, no pushing or pulling, no gripping or grasping, weightlifting restricted to 5 lbs.  AR 1022.

On July 9, 2013, Dr. Thomas Harris conducted a "Panel Qualified Medical Examination" on Plaintiff.  AR 1117-1129.  At that visit, Dr. Harris noted Plaintiff was taking Vicodin, naproxen and Omeprazole for pain as needed.  AR 1123.  His examination revealed tenderness around the elbow, but examination of the right wrist revealed normal range of motion, muscle, and grip strength as well as normal sensation.  AR 1125.  In Dr. Harris's opinion, Plaintiff had reached a level of maximum medical improvement for his industrial injury.  AR 1125.  He gave Plaintiff a 20% upper extremity impairment and a 12% whole person impairment.  AR 1126.  Dr. Harris opined that Plaintiff had reached a plateau following his elbow surgery and is unlikely to change with or without medical treatment.  AR 1127.

Here, the ALJ erred in discrediting the opinions of Drs. Magshoudy, McClurg, and Harris as to Plaintiff's right arm limitations during the discrete time between April 2012 and July 2013.  Drs. Magshoudy and McClurg were "treating physicians."  For Social Security applications filed before March 27, 2017,[12] the medical opinion of a treating

---

[12] On January 18, 2017, the SSA revised the regulations that apply to evaluation of medical evidence, effectively abolishing the "treating physician rule" for cases filed on or after March 27, 2017.  This

physician is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with the other substantial evidence in claimant's medical record.  *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (quoting 20 CFR §§ 404.1527(c)(2)).  Because Plaintiff's application was filed on May 27, 2014, before the rule change, the treating physician rule applies here.

When an ALJ gives a treating physician's opinion less than controlling weight, the ALJ must do two things.  First, the ALJ must consider other factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician.  *Id*. 404.1527(2)-(6); *Trevizo*, 871 F.3d at 675.  Generally, the longer a treating source has treated a claimant, the more weight the ALJ should give to the treating source's opinion.  *Id*.  Further, the more knowledge a treating source has about Plaintiff's impairments, the more weight his/her opinion deserves.  *Id*.  The ALJ should consider the treatment the source provided, along with examinations and testing performed or ordered. *Id*.  A treating source's opinion deserves more weight if it is supported by the relevant evidence, such as medical signs and laboratory findings.  *Id*.  The ALJ should also consider the quality of explanations the source provides for his/her opinion.  *Id*.  The failure to consider these factors, by itself, constitutes reversible error.  *Id.* at 676.

Second, the ALJ must provide reasons for discounting the treating physician's opinion.  When a treating physician's opinion is not contradicted by another physician, the ALJ must provide "clear and convincing" reasons for rejecting or discounting the opinion, supported by substantial evidence.  *Id.* at 675.  When a treating physician's opinion is contradicted by another physician, the ALJ must provide "specific and legitimate reasons" for rejecting or discounting the treating physician's opinion,

---

means that an ALJ no longer must assign a certain weight to a medical practitioner's opinion.  Rather, ALJs are now to "consider" the "persuasiveness" of opinions from all medical sources.  20 C.F.R. § 1520c(a).

1  supported by substantial evidence.  *Id.*  The ALJ can meet this burden by setting out a

2  thorough summary of the facts and the conflicting medical evidence, stating his or her

3  interpretations and conclusions, and then making findings.  *Revels*, 874 F.3d at 654.

4       The ALJ assigned "little weight" to the opinions of Drs. Magshoudy, McClurg, and

5  Harris because "these doctors did not rely on Social Security rules and regulations and

6  often did not contain a thorough explanation or analysis."  AR 45.  However, these

7  doctors' opinions were well supported by their notes, reports, and references to objective

8  testing.  *See* AR 978-979, 1071-1072, 1133.  The ALJ also erred in determining these

9  opinions were "generally overly restrictive as well as unsupported by and inconsistent

10 with the longitudinal record."  *Id.*  Though the ALJ may have appropriately discounted

11 their opinions as unrepresentative of Plaintiff's condition during the whole five-year

12 period covered by the claim, it was not appropriate to discount their opinions for the

13 limited time from April 2012 through July 2013, when these doctors saw Plaintiff

14 following his elbow injury.  The ALJ's reasons for discounting these doctors' opinions

15 does not meet the "clear and convincing" standard for rejecting or discounting the

16 opinions.

17      By contrast, Dr. Jeff Altman, whose consulting opinion was given "significant

18 weight," by the ALJ (AR 43) saw Plaintiff in August 2017, over four years after

19 Plaintiff's elbow surgery.  AR 3432-3428.  His opinion that Plaintiff can "lift and carry

20 20 pounds occasionally and 10 pounds frequently; can never reach overhead with the

21 right upper extremity and can otherwise frequently use his right upper extremity" may be

22 accurate as to Plaintiff's capacity four years after his elbow surgery, but it is not a valid

23 reason to discredit the contrary views of the treating physicians during an earlier period.

24 *See Smith v. Kijakzi*, 14 F. 4th 1108, 1116 (9th Cir. 2021).

25      In sum, the Court finds that the ALJ erred in discounting the opinions of Drs.

26 Maghsoudy, McClurg, and Harris as to Plaintiff's limitations during the limited time they

27 treated him for his right elbow injury.

28      C.  **The ALJ Properly Found Plaintiff's Mental Impairment Is Not Severe and**

**Does not Impede His Ability to Perform His Past Work as A Tax Preparer**

Plaintiff does not challenge the ALJ's Step two finding that his mental impairment was not severe.  ECF 16, at 7-9.  Rather, he argues that the ALJ should have considered his mild mental impairments at step 4 in determining his residual functional capacity to work as a tax preparer.  *Id*.  But that is exactly what the ALJ did.

At Step two, the ALJ determined that Plaintiff's mental impairment of "depressive" did not cause more than minimal limitation in his ability to perform basic work activities and was therefore nonsevere."  AR 39, 579-583, 1268-1273.  The ALJ evaluated Plaintiff's mental impairments in each of the functional areas ("Paragraph B" criteria).  He determined that Plaintiff has only mild limitations in "concentrating, persisting, or maintaining pace, and no limitations in understanding, remembering, or applying information, interacting with others, or adapting or managing oneself."  *Id*. Those findings were amply supported by the opinion of Dr. Gregory Nicholson, a psychiatrist, who conducted a Comprehensive Psychiatric Examination on November 15, 2014.  AR 1268-1273.  At that time, Plaintiff's chief complaint was depression.  AR 1268.  Based on his examination, Dr. Nicholson's functional assessment was as follows:

- Plaintiff can understand, remember, and carry out simple one or two-step instructions and he can do detailed and complex instructions.

- Plaintiff is capable of handling funds.

- Mild limitations in ability to relate and interact with co-workers and the public.

- Mild limitations in ability to maintain concentration and attention, (persistence and pace is not limited)

- Mild limitations in ability to accept instructions from supervisors.

- No limitations in ability to maintain regular attendance in the workplace and perform work activities on a consistent basis.

- No limitation in ability to perform work activities without special or additional supervision.

1  AR 1272.

2  The ALJ also relied on the state agency doctors, Drs. Alan Berkowitz and G.

3  Johnson, who similarly found no severe mental limitation.  AR 43, 105-106, 119-120,

4  noting that although these doctors did not treat or examine Plaintiff, their finding of no

5  severe mental impairment comports with the longitudinal record and the determination

6  that Plaintiff has average intellect, good interpersonal contact, cooperative demeanor,

7  ability to perform serial threes, coherent and organized thought processes, intact insight

8  and judgment, and normal mental status.  AR 1231, 2301, 3857.

9  The ALJ here did not include any mental limitations in the RFC because he

10  determined that whatever mild limitations Plaintiff may have do not affect his ability to

11  interact with his wife, do the laundry, drive his own car, dress, bathe, handle bills and

12  cash appropriately, and go out on his own.  AR 1270.  His neat and casual grooming,

13  good eye contact, cooperative approach, and coherent and organized thought process do

14  not suggest mental limitations that would limit his ability to act as a tax preparer.  *Id.*

15  For those reasons, the Court finds no error in the ALJ's failure to include a "mild

16  mental limitation" in his hypothetical to the vocational expert or in his determination that

17  Plaintiff had the RFC to perform his past work as a tax preparer.

18  **V.   CONCLUSION**

19  The ALJ carefully reviewed Plaintiff's disability claim, held two hearings, and

20  conducted a thorough review of the record.  Nevertheless, he erred by making a single

21  disability determination for the entire five-year period of the claim without considering

22  whether Plaintiff was disabled by his right hand/arm limitations during an earlier period

23  and finding certain of Plaintiff's doctors' opinions unreliable for this reason.  This error

24  affected the ALJ's final conclusions as to Plaintiff's RFC.  Therefore, the Court

25  **REMANDS** to the ALJ to determine whether Plaintiff is entitled to disability during a

26  discrete time while he was being treated for and received surgery on his elbow.  The

27  Court finds no other error based on the issues raised in Plaintiff's motion.

28  For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN**

1    **PART** Plaintiff's motion for summary judgment, **GRANTS** Plaintiff's motion to remand,

2    and **GRANTS IN PART AND DENIES IN PART** Defendant's motion for summary

3    judgment.  The case is remanded for further proceedings consistent with this Order.

4         **IT IS SO ORDERED.**

5    Dated:  August 15, 2022

6

7                      Hon. Nita L. Stormes

                       United States Magistrate Judge